**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 07 2012, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN C. BOHDAN**
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL D. MCCLELLAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1204-CR-180 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Frances C. Gull, Judge
Cause No. 02D05-1101-FC-13

**December 7, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Following a jury trial, Michael D. McClellan was convicted of two counts of class C felony Stalking.[1] The trial court imposed an aggregate executed sentence of ten years in prison. On appeal, McClellan argues that his sentence is inappropriate.

We affirm.

Dawn Hillyer (at the time, Krohn) ended a casual dating relationship with McClellan in July 2005. They eventually resumed a friendship the following summer, but Hillyer terminated the friendship around the beginning of August 2006 after a falling out with McClellan. There was no further contact between the two until October 12, 2006.

On that evening, Hillyer was driving back from Chicago with her new boyfriend when McClellan called her twenty-six times in a row and sent texts indicating that she needed to call him right away. She eventually answered one of the calls and denied McClellan's request to come over to her house that night. He came over anyway and presented her with an alleged background check he had obtained on her and told her that she had some explaining to do. When she denied that the background check had anything to do with her, McClellan indicated that he loved her and that was the real reason for his visit. Hillyer rejected him.

From that evening on, McClellan contacted Hillyer multiple times daily by phone, text, email, and/or in person. For example, on October 15, he called her eighty-eight times in a two-hour period. He left long, rambling voicemail messages and emails about how they belonged together and how much he loved her. In addition to calling at all hours of the day

---

[1] Ind. Code Ann. § 35-45-10-5 (West, Westlaw current through 2012 Second Regular Session).

and night, McClellan came to Hillyer's house and place of employment on multiple occasions in October. He left gifts, cards, and flowers despite her pleas for him to leave her alone.

On the evening of October 26, 2006, McClellan came to Hillyer's home and confronted her then boyfriend, Lance Adams, stating how much he loved Hillyer. McClellan finally left when Hillyer began to call the police. McClellan then called Hillyer over twenty times that night, leaving angry messages about Adams.

On November 1, McClellan came to Hillyer's work and home multiple times before heading to Florida. He returned to her home on November 4 with champagne and glasses, pledging that he was moving to Florida and this was a goodbye toast. McClellan, however, did not leave for Florida and continued showing up everywhere. "There was constant contact, constant calls, constantly around work, constantly at the gas station … beside [Hillyer's] house, constantly on [her] street". *Trial Transcript* at 203.

On November 8, he came to her work on multiple occasions demanding to see her. Hillyer eventually came to the front office and took him outside, where she demanded that he stop harassing her. The phone calls continued, so that evening Hillyer filed a police report against him. Within ten minutes of making the report, McClellan showed up at her house. One of Hillyer's children called the police, while she pleaded with him to leave. Several police officers arrived and told McClellan to leave the premises. The following day, Hillyer sought and obtained a protective order against McClellan.

Within two days of the protective order being issued, McClellan was back at it.

Hillyer called him around mid-November in an attempt to reason with him and plead with him to stop, indicating that it was affecting her children and that she "needed him to stop." *Id*. at 214. On November 20, he demanded that she drop the protective order. She stated that she would consider dropping it if he left her alone. He did not. After many phone calls the following day, Hillyer finally answered a call and used strong language to tell him to leave her alone. She then hung up the phone and never again answered another one of his calls or messages.

On November 22, McClellan again came to her work. Scared, Hillyer went home and gathered her things so that she could stay with a friend that night. She sent her children to her ex-husband's house, as she had on other occasions, for protection. Hillyer also filed another police report that day.

On November 26, McClellan confronted Hillyer, Adams, and friends at a local club. As he yelled at them, Hillyer immediately went to get security and informed them of the protective order. In the meantime, McClellan ranted about Hillyer and her friends and stated, "he was gonna 'kill the bitch', meaning [Hillyer]". *Id*. at 217. Once again, he told Hillyer that she needed to drop the protective order or she "was gonna be sorry." *Id*. She was extremely shaken and scared by the threat. As a result, Hillyer filed yet another police report, and Adams ended his relationship with her.

Phone calls and hundreds of emails continued from McClellan. In December, Hillyer began to date Christopher Hillyer, whom she eventually married. On December 21, 2006, a hearing was held on the protective order Hillyer had previously secured and it was removed.

4

The judge, however, warned McClellan to stay away from Hillyer and informed Hillyer that she could file for another protective order if he did not. Within a couple hours of the hearing, McClellan contacted her again.

On the morning of December 22, Hillyer sought and obtained another protective order. McClellan, however, confronted Hillyer that evening while she was out with Christopher and friends. When Christopher stepped in, McClellan asked if he wanted to "take this outside". *Id*. at 495. McClellan was escorted out by a police officer and advised of the protective order. Shortly thereafter, Hillyer's cell phone started "getting blasted with text messages". *Id*. at 496. She was "almost hysterical". *Id*. at 497.

The next day, McClellan made a false report to police indicating that he feared Hillyer was going to commit suicide. Police officers responded to Hillyer's home for a welfare check and were notified of the protective order. As a result, an officer met with McClellan and once again explained that he was to have no contact of any kind with Hillyer.

In January, Hillyer changed her phone number and email address. McClellan hacked into her new email account and changed the password on January 20. Hillyer discovered this two days later after she could not log into her account. She was once again required to change accounts. As a result of the hacking, however, McClellan had already obtained personal emails and photos, as well as her address list of friends, family, and clients. In addition to incessantly contacting Hillyer, McClellan began emailing everyone on her contact list (including business contacts) using a number of anonymous email addresses. The emails became increasingly vulgar and threatening and often had photos, including a topless picture

of Hillyer. In his newly-sophisticated attack, McClellan began in February using phone calls with computer-generated messages to Hillyer's home, cell, and work phones, as well as to her friends and family. During this time, Hillyer was also seeing McClellan constantly near her home, office, and "everywhere". *Id*. at 242.

In February 2007, Detective Lorrie Bandor of the Fort Wayne Police Department was assigned to Hillyer's case, and Hillyer was directed to make all reports directly to Bandor. Hillyer turned her personal computer over to Bandor to assist in the investigation on March 5, 2007. The investigation, which was delayed to some extent by Bandor's absence from work for personal reasons, continued over the next several years.

Despite being aware of the investigation and interviewed by Bandor in February and May 2007, McClellan continued harassing Hillyer through January 2008. As a result, Hillyer put her house up for sale, moved, changed cars, and closed her Comcast account entirely. She eventually married Christopher in July 2007. Although McClellan's last contact was an email sent January 14, 2008, Hillyer testified at the 2012 trial that she was fearful of him and was still suffering from the effects of his stalking.[2]

---

[2]  When asked at trial how McClellan's actions affected her personally, Hillyer responded:

> The question is how didn't it affect me. It affected everything in my life, whether it be my children and not playing outside to switch – changing my entire life around to – I mean, I added security lights and peep holes and dead bolts. Just in general it's – everything is always looking over your shoulder. I started shopping different places. When I ended at Swanson Staffing, which was in 2008, I was a branch manager there, I was always out networking, I was always in front of the crowd and really out there, I took a year off in seclusion. I didn't go anywhere by myself, I didn't do anything, which is a huge difference; and even in my job today that I have, it's very controlled. I don't do that same type of stuff. I don't go out …. I lost that entire part of me. The – everything, from the – everything: The way I shop; the kids; constantly, even to this day, looking around to see who's driving around you constantly. I can't sit with my back to a door…. You can't imagine living like that, like there's no at ease, there's no relaxing, there's no – you just don't know. It's terrifying.

On January 11, 2011, the State charged McClellan with three counts of stalking. Counts I and II, both class C felonies, related to Hillyer,[3] and the alleged victim in Count III was Christopher. At the conclusion of a four-day jury trial, which commenced on February 14, 2012, the jury returned guilty verdicts on Counts I and II and acquitted McClellan on Count III. On March 23, 2012, the trial court sentenced McClellan to consecutive sentences of five years on each count, for an aggregate executed sentence of ten years.[4] McClellan now appeals his ten-year sentence as inappropriate in light of his character and the nature of the offense.[5]

We have the constitutional authority to revise a sentence if, after careful consideration of the trial court's decision, we conclude the sentence is inappropriate in light of the nature of the offense and character of the offender. *See* Ind. Appellate Rule 7(B); *Anglemyer v. State*, 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. The burden of persuading us that the sentence is inappropriate is on the defendant. *Rutherford v. State*, 866 N.E.2d 867 (Ind. Ct. App. 2007).

---

*Id*. at 268-69.

[3] Count I alleged that sometime between October 12, 2006 and January 2008, McClellan knowingly or intentionally stalked Hillyer and "did make an explicit and/or implicit threat with the intent to place [Hillyer] in reasonable fear of sexual battery, serious bodily injury, or death". *Appellant's Appendix* at 18. Count II alleged that sometime between December 22, 2006 and January 2008, McClellan knowingly or intentionally stalked Hillyer "and a [sic] order of protection under I.C. 35-26-5 had been issued to protect [Hillyer] from [McClellan] and [McClellan] had been given actual notice of the order". *Id*. at 19.

[4] The State requested a ten-year sentence with two of those years suspended to probation.

[5] McClellan asserts without offering any authority or argument that he received a maximum sentence, apparently relying on the "episode of criminal conduct" limitation found in Ind. Code Ann. § 35-50-1-2(c)(2) (West, Westlaw current through 2012 Second Regular Session). Because all parties and the court appear to have proceeded under this assumption below, we will accept it as true for purposes of our analysis.

Even if a trial court follows the appropriate procedure in arriving at its sentence, we maintain the constitutional power to revise a sentence we find inappropriate. *Hope v. State,* 834 N.E.2d 713 (Ind. Ct. App. 2005). Because sentencing in Indiana is primarily a discretionary function, however, "the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). Thus, "[t]he principal role of appellate review should be to attempt to leaven the outliers". *Id*. at 1225. Our analysis of the appropriateness of a sentence "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224.

With respect to the nature of the offenses, McClellan contends that the "circumstances [in this case], a pattern of extensive and extended harassment, are already inherent in the language of the level of the offense charged." *Appellant's Brief* at 19. He then asserts: "the very aspects that elevate these offenses to C felonies should not also be employed to impose enhanced, executed sentences at the greater C felony level." *Id.*

The charge in Count I was elevated to a class C felony based upon McClellan making a threat, while stalking Hillyer, with the intent to place her in reasonable fear of serious bodily injury or death. Count II was elevated based upon the existence of a protective order (the order issued December 22) of which McClellan had actual knowledge at the time he stalked her. McClellan fails to explain how the trial court relied upon these additional elements to impose enhanced sentences.

Moreover, we cannot agree with McClellan's apparent assertion that his crimes

8

otherwise constituted run-of-the-mill stalking. "Stalk" is statutorily defined as "a knowing or intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." I.C. § 35-45-10-1 (West, Westlaw current through Second Regular Session). "The statute's 'repeated' requirement can be met with only a small number of contacts, provided they are 'repeated' contacts." *Smith v. State*, 839 N.E.2d 780, 788 (Ind. Ct. App. 2005). *See also Johnson v. State*, 721 N.E.2d 327, 332-33 (Ind. Ct. App. 1999) ("the term 'repeated' in Indiana's anti-stalking law means 'more than once'"), *trans. denied*. Further, our Supreme Court has recently made clear that "[s]talking could occur over a matter of minutes or years." *Nicholson v. State*, 963 N.E.2d 1096, 1103 (Ind. 2012).

The record before us indicates that McClellan's violations far exceeded that required for conviction under the statute. There are literally thousands of documented emails, phone calls, and text messages, with which Hillyer was accosted for well over a year. During this time, McClellan followed and confronted her at home, work, and in public. After Hillyer obtained the protective order in December 2007, McClellan intensified his attack using surreptitious electronic means. Specifically, McClellan hacked into her email account and obtained her private emails and pictures. After creating several anonymous email accounts, he then barraged Hillyer's personal and business contacts, as well as Hillyer, with emails defaming her reputation. Often, these vile emails included topless photos of Hillyer. He also began using computer generated calls to Hillyer and others.

9

The trial court thoroughly addressed the particularly egregious nature and circumstances of McClellan's offenses:

> I do consider as a [sic] aggravating circumstance the extraordinary impact that your conduct has had on the people that have testified specifically the Hillyer's [sic] and their family and friends. [T]he damage that you have inflicted far exceeds that which is normally associated with a Class C Felony. And particularly in our day and age Mr. McClellan, everybody is awfully dependent on electronic devices…. But you demonstrated Mr. McClellan and [sic] extraordinary capability to manipulate those things much as you've manipulated people in your entire life. You are extremely bright, extraordinarily bright, to the point that you were able to access your neighbor's internet and change passwords and hack into e-mail accounts, both e-mail accounts at work and at home, and you copy things and you get six hundred pages plus of exhibits that were shown to this jury. And the talent that you had in that field that you used to send horrible messages, vile, disgusting, threatening, thousands and thousands of phone calls, e-mails and messages. It wasn't enough for you Mr. McClellan to just contact this lady and make her life a living hell, which you did, you had to involve her children, her clients, her friends, her acquaintances, to embarrass her, control her and manipulate her. And are you sorry? Yeah, I'll bet you're sorry she wouldn't give up and she never did give up and this has always been about control Mr. McClellan. The control that you have over people and things and that makes you an extraordinarily scary individual because the depth and breadth of your behavior is shocking and astonishing and it's frightening. I heard…the message that you left for all of these people that testified. I've been on the bench a long time, I was a prosecutor a long time, and normally words, that's all they are, just words. These were very threatening and intimidating words and I think you meant every single one of them Mr. McClellan.

*Sentencing Transcript* at 79-81. The State argued at sentencing that McClellan engaged in "constant pre-meditated manipulation of every aspect of [Hillyer's] life", amounting to literally "a global onset of harassment at every imaginable level." *Id.* at 64-65. We agree and find that the nature of McClellan's offenses clearly merited a lengthy executed sentence.

Moreover, McClellan has not established that consecutive sentences were inappropriate in this case. The trial court based its decision to order consecutive sentences on

10

"the separate nature of the offenses and the fact that each involves a separate time frame and course of conduct." *Id*. at 82. While the time periods listed in the charges overlapped to some extent, a review of the record reveals the State established at trial that McClellan engaged in a two-stage attack on Hillyer. The first stage (Count I) was focused on the direct harassment of Hillyer through emails, phone calls, text messages, and personal encounters at work, home, and out in public. This stage included the threat made in a public establishment on November 26, 2007, and continued until the issuance of the protective order on December 22, 2007. The second stage (Count II) occurred after the protective order was issued and involved a ramped-up, high-tech assault on Hillyer, in which McClellan's harassment of Hillyer quickly spread to her friends and business contacts.

We now turn to McClellan's character. In this regard, McClellan directs us generally to "testimonials from family and acquaintances who knew firsthand of positive aspects in Mr. McClellan's life". *Appellant's Brief* at 20. He also notes that his criminal history of five misdemeanors included "lower misdemeanor offenses, years removed, two of which were for operating while suspended." *Id*. at 19-20.

We agree with McClellan, as did the trial court, that his record of criminal convictions is not worthy of great aggravating weight. It is important to note, however, that he has a past conviction in 1998 for invasion of privacy, which involved the violation of a protective order issued in favor of his ex-wife.

Most telling of McClellan's character is his long history of harassing women. In addition to Hillyer, there is substantial evidence in the record of at least two other women

11

whom he has terrorized over the years. The first began in 1998 with the harassment of his ex-wife, who remains in "constant fear" of him even to this day. *Sentencing Transcript* at 56. That harassment lasted about a year and involved following his victim and making repeated phone calls and threats, much like stage one of his attack in the instant case. The record also reveals that McClellan turned his sights to a new woman, Crystal Teixeria, sometime in 2008 or 2009 through 2011. Teixeria testified the he went to "desperate attempts" to contact her, through phone calls, texts, and death threats. *404 Hearing Transcript* at 46. According to Teixeria, McClellan "opened accounts in my name like Facebook, he pretended to be me. Stole my identity." *Id*. Detective Bandor testified at the sentencing hearing that McClellan even took aim at her and her family during the investigation, using "very personal" information that "he truly should not have had." *Sentencing Transcript* at 59.

Regardless of the recent positive impact McClellan has apparently had on other drug addicts, the record establishes that he is highly likely to reoffend if given the chance. We note the trial court's observations in this regard:

> It's obvious to this court over the course of the pendency of this case that these are circumstances that are likely to reoccur. I heard the 404 evidence. This has been going on for some time. It appears you get fixated on people or situations or things and then that becomes the issue in your life.
>
> ****
>
> The character that I heard from these folks, from your family and friends today, is not consistent with the character that I heard at trial and you tell me today that you're a cocaine addict and I failed to see and heard no evidence Mr. McClellan that connects that addiction…and the evidence of what you did in Counts I and II…. I see an attempt Mr. McClellan to continue to control and manipulate. And the control and the manipulation will stop. You may continue with it, it stops with me sir.

*Id.* at 77-78, 81.

After due consideration of the trial court's decision, we conclude that McClellan's ten-year executed sentence is not inappropriate in light of the nature of his offenses and his character.

Judgment affirmed.

BROWN, J., and PYLE, J., concur.